**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Joseph HORTON and Willie F. Jordan,**
**Defendants-Appellants.**

**No. 72–3574.**

United States Court of Appeals,
Fifth Circuit.

Nov. 28, 1973.

Rehearing and Rehearing En Banc
Denied Jan. 3, 1974.

---

8. 54 Stat. 885.

9. 62 Stat. 622.

William C. Starke, Chicago, Ill., Albert Armendariz, El Paso, Tex., Gerald M. Werksman, Chicago, Ill., for defendants-appellants.

William S. Sessions, Edward S. Marquez, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before AINSWORTH, GODBOLD and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

Defendants Horton and Jordan appeal from their convictions under 21 U.S.C. § 841(a)(1)[1] for possessing with intent to distribute three pounds and two ounces of heroin, a Schedule I controlled substance. In a trial before the court, Horton and Jordan were found guilty and each sentenced to ten years imprisonment with a special parole of ten years. There are three principal issues on this appeal: (1) whether the defendants were properly arrested on the basis of probable cause; (2) whether Horton validly consented to the search that revealed the heroin; and (3) whether there was sufficient evidence to convict Jordan. We hold that probable cause existed for their arrest, that Horton consented to the search, but that there was insufficient evidence to convict Jordan. We therefore affirm Horton's conviction, but reverse as to Jordan.

The events that led to the arrest of the defendants commenced on September 1, 1972, when a customs agent in Chicago, Diogenes Galanos, received a telephone call from an anonymous informer. The caller gave Galanos the following information: (1) that Willis Minnieweather, a black male approximately thirty years of age and weighing 180 to 190 pounds, was en route from Chicago to El Paso, Texas, to procure a substantial quantity of heroin; (2) that Minnieweather was driving a 1966 Oldsmobile with a black vinyl top and a brown bottom and bearing the license number BM 1390; and (3) that Minnieweather was to be accompanied by another black male approximately twenty-five to thirty years of age. Galanos attempted to verify the ownership of the vehicle bearing this license, and an investigation revealed that the license was issued to a 1967 Buick registered in the name of Willis Minnieweather. Galanos relayed the information he had obtained to Agent A. L. Fears in the El Paso Customs Office. On receiving this information, Agent Fears began checking at the hotels and motels in the El Paso locality and located the 1966 Oldsmobile at the Travelodge-Central Motel. Fears learned from the manager of the motel that a man named Jordan was registered

---

1. Sec. 841(a)(1) provides as follows:

"(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

in rooms 408, 409 and 412, and that a person named Minnieweather had made several telephone calls from the hotel to numbers located in the west side of Chicago, an area where problems with narcotics are prevalent. The automobile was placed under intermittent surveillance and was last seen on September 3, 1972, when it left the Travelodge occupied by two males, a female and a child, all unidentified, and proceeded east on Interstate Highway 10.

On September 11, 1972, Agent Galanos received a second call from a person identifying himself as the one who had called previously about Minnieweather. The caller informed Agent Galanos that the persons discussed in their previous conversation were returning to El Paso to procure a quantity of heroin to bring back to Chicago. Galanos immediately related this latest information to Agent Fears in El Paso. Fears conducted an investigation and found that two men, Joseph Horton and Willie Jordan, were registered in the Downtowner Motor Inn in El Paso and were accompanied by two females.

Fears initiated surveillance of Horton and Jordan's activities. At approximately 6 P.M. Horton left the Downtowner Motel in a taxi and went to the Knights Club, a bar in the El Paso Rodeway Inn. After waiting there for a short period of time, he returned to the waiting taxi and went back to the Downtowner. At 8 P.M. both Horton and Jordan returned, via taxi, to the Rodeway bar, but remained there for only five to ten minutes. They then went back to the Downtowner. Later that evening Horton, traveling alone and by taxi, left the Downtowner carrying a grey attache case and went to yet another hotel, the Airways Holiday Inn. Although he never entered this hotel, Horton stood near the entrance with the grey attache case for approximately thirty minutes. The surveillance team reported that he appeared to be waiting for someone, but no one appeared.

From the Airways Horton proceeded, again by taxi, to the Midtown Holiday Inn. He was still carrying the attache case when he arrived there. Shortly thereafter, Jordan arrived at the Midtown in a 1971 black Chrysler. After loitering around the vehicle for a few minutes, Jordan joined Horton at the entrance of the hotel. Horton and Jordan walked to a telephone booth adjacent to the hotel's parking lot and apparently made two telephone calls. They then traveled from the Midtown Holiday Inn back to the Airways Holiday Inn, where Jordan got out of the automobile and waited at the entrance of the Flame Room located at the Airways. Horton returned to the car, and as the automobile proceeded east on Interstate 10, surveillance was discontinued.

Horton and Jordan were next observed on the following day when they arrived at the Rodeway in the 1971 Chrysler accompanied by the two females. Horton entered the Knights Club located there and met with a Mexican male for approximately five minutes. The Mexican left the club through the rear entrance, and Horton followed within about three minutes. Meanwhile Jordan had entered the motel through the front entrance. Both Horton and Jordan were next seen returning to the Chrysler through the front entrance of the Rodeway. The defendants entered the 1971 Chrysler and went to a gasoline service station where they apparently had the automobile serviced. Surprisingly, the four occupants of the car got into a taxi and drove to the El Paso airport. While two agents remained at the service station where the 1971 Chrysler was located, other agents followed the taxi to the El Paso airport. When the cab was near the passenger entrance to the terminal, it was stopped. The agents, with weapons drawn, ordered the four occupants out of the cab. The males and the taxi were searched as were the ladies' purses, and the four suspects were placed in handcuffs.

After Agent Fears identified himself, Horton gave his name and stated that they were all flying to Chicago. Fears inquired as to who owned the 1971 black

Chrysler that was left at the service station. Although subsequent investigation revealed that the automobile actually belonged to Jordan, Horton replied that the vehicle was his and the appropriate keys were found on Horton's person. Agent Fears testified that "[a]t this time I told Mr. Horton that we were going to search the Chrysler and wanted to know whether or not he had any objections to us taking him back to the vehicle and searching that vehicle." Horton responded that he had no objection.

The agents and the four suspects returned to the service station where the 1971 Chrysler was located. The suspects again were asked who owned the vehicle, and Horton replied that it was his. Agent Fears testified that Horton was asked for the second time "whether or not he had any objection to us searching the vehicle and again he stated he had no objection." As the car was searched a locked grey attache case was found in the trunk. Horton stated that the case was his, and he produced the key. Inside the case the agents discovered three pounds, two ounces of heroin.

Immediately after the seizure, the defendants were given their Miranda[2] warnings and taken to the customs office in El Paso. At the customs office Agent Fears asked Horton if he would like to make a statement regarding this incident. Agent Fears testified that "[a]t this time Horton stated the heroin was produced with his money, that the heroin was his, and that the two females did not know anything about the heroin." When asked whether Jordan knew of the heroin, Horton first stated "Yes" then "No," and then that "he thought that Mr. Jordan knew what was going on." Agent Fears also testified that Horton wanted to assume the blame for the incident.

In a second interview with Horton later that evening, Agent Fears advised Horton of his constitutional rights and asked for a detailed account of the events. Horton reiterated that the heroin was his, that it was purchased with his money, and that he was taking the heroin back to Chicago. He had gone to the El Paso International Airport to meet a man named Minnieweather. Horton stated that Minnieweather had been with him in El Paso the previous day, but had flown back to Chicago that same day.

Jordan also made a statement regarding the incident. After receiving his Miranda warnings, Jordan said that he and the two females had driven from Chicago and met Horton and Minnieweather at the Downtowner Motor Inn. While staying at the Downtowner, a Mexican male had called upon Horton and the two had left the presence of Jordan. The substance of the conversation with the Mexican was unknown to Jordan. Horton subsequently asked Jordan to meet him at the hotel on September 11, 1972. Jordan did not know why he was to meet Horton at this hotel, but believed that Horton was going to meet someone there. Jordan also stated that he had been cooperating with another agency in Chicago, although he did not say which agency, in an effort to provide information of illicit activities. Jordan stated that he knew Minnieweather and that Minnieweather had been in El Paso on at least two prior occasions to purchase narcotics.

## I.

We turn first to the issue whether the customs officials had probable cause for the initial arrest of the defendants when they arrived at the El Paso airport. The Supreme Court in Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), recognized that, in a warrantless arrest situation, probable cause may be established based upon an informant's tip if there is subsequent corroboration of the details of the tip to insure reliability. Although the informer in Draper had previously given accurate and reliable

2. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

information, he did not state the means by which he obtained his information. Instead the informer described in great detail the surrounding facts and circumstances of the reported crime. The informant stated that Draper had traveled to Chicago the previous day and would be returning by train to Denver. Draper was to arrive in Denver on one of two particular mornings, and he would be possessing three ounces of heroin. The informer further described the clothing that Draper would be wearing when he returned to Denver. As these facts were specifically corroborated by on-the-scene observation when Draper arrived in Denver, the Court held that probable cause had been established, and Draper's arrest was therefore valid.

■ Applying the *Draper* principle to the facts of this case, we hold that probable cause for the arrest was established. Although the informant under these facts was anonymous, there was sufficient corroboration of the details of the report to establish both the reliability of the informant and that the informant had obtained his information in a reliable way. *See* Spinelli v. United States, 393 U.S. 410, 416–417 and n. 5, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); United States v. Legato, 480 F.2d 408, 412, n. 10 (5th Cir., 1973); United States v. Berry, 150 U.S.App.D.C. 187, 463 F.2d 1278, 1281 (1972); Government of the Canal Zone v. Wright, 460 F.2d 1402, 1403 (5th Cir., 1972); United States v. Squella-Avendano, 447 F.2d 575, 582–583 (5th Cir., 1971); United States v. Crane, 445 F.2d 509, 519 (5th Cir., 1971); United States v. Dzialak, 441 F.2d 212, 216 (2nd Cir., 1971); United States v. Ardle, 435 F.2d 861, 862–863 (9th Cir., 1971); United States v. Viggiano, 433 F.2d 716, 718–719 (2nd Cir., 1970); Cali. v. United States, 338 F.2d 974, 977 (1st Cir., 1964). *See also* United States v. Evans, 481 F.2d 990, 992 (9th Cir., 1973). As to the first excursion in El Paso and the informant's first

report, the information was corroborated in that the described persons were in fact in El Paso, they were driving the black and brown 1966 Oldsmobile, and the license was issued to Minnieweather.

In addition to the investigating officer's observations that corroborated the specific details of the informer's report, the customs agents observed other circumstances indicating possible criminal conduct. During the surveillance previously described, the agents observed that the suspects were simply not conducting themselves in the manner of typical tourists or businessmen.

In arriving at the conclusion that probable cause existed, we recognize that there were actually two excursions to El Paso and that the unidentified informer gave information on two separate occasions. The detailed information was more specifically corroborated in the first report than in the second report. We do not feel, however, that probable cause must be established independently as to each sojourn to El Paso. We consider both informants reports to be in regard to a single continuing criminal occurrence that involved two trips to El Paso. The type of criminal activity, the locations and the parties to the illicit activities are basically the same. Therefore, based upon the specific detailed information of the informant's reports, in addition to the agents' observations of the appellants' activities indicating criminal conduct, we hold that the constitutional requirement of probable cause is satisfied.

## II.

■ We turn next to the issue whether the trial court improperly admitted into evidence the heroin that was discovered as a result of the search of the 1971 Chrysler.[3] The trial court failed to make findings of fact and conclusions of law regarding defendants' motions to suppress, and there is no indication in

3. Jordan has standing to challenge the admissibility of the heroin because he has been charged with its possession. Jones v. United States, 362 U.S. 257, 264, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); United States v. Legato, *supra*, at 410, n. 6 of 480 F.2d.

the record as to the legal theory upon which it relied in admitting the evidence. Although such findings are purely discretionary, this court can depart from them only if found to be clearly erroneous. Since no findings were entered, however, we must independently review the record to determine whether there is any reasonable view of the evidence that supports the admissibility of the heroin. United States v. Montos, 421 F.2d 215, 219 n. 1 (5th Cir., 1970), cert. den., 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970). Because of the limitation imposed upon the search incident to arrest, the search cannot be upheld on this principle. It is not contended that the search was an investigatory search, a border search or that the search falls within the automobile exception to the Fourth Amendment. Therefore, the only possible theory upon which this search may be upheld is on the basis of a voluntary consent search.

 It is well settled that a search authorized by consent results in a relinquishment of Fourth Amendment rights. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); Katz v. United States, 389 U.S. 347, 358, n. 22, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Zap v. United States, 328 U.S. 624, 630, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946); Davis v. United States, 328 U.S. 582, 593–594, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946). When consent is the alleged justification for a search, the burden is on the government to demonstrate that it was "freely and voluntarily given" and not simply "acquiescence

to a claim of lawful authority." Bumper v. North Carolina, 391 U.S. 543, 548–549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); see Johnson v. United States, 333 U.S. 10, 16–17, 68 S.Ct. 367, 92 L. Ed. 436 (1948). Moreover, the defendant need not be informed specifically of his Fourth Amendment rights, United States v. Jones, 475 F.2d 723, 731 (5th Cir., 1973); United States v. Canseco, 465 F.2d 383, 385 (5th Cir., 1972), nor must the investigating officer state that he will refrain from searching if the defendant refuses to give permission. United States v. McCann, 465 F.2d 147, 158 (5th Cir., 1972); United States v. Resnick, 455 F.2d 1127, 1133 (5th Cir., 1972). Finally, voluntariness is to be determined from all the facts and circumstances surrounding the defendant's alleged consent. Schneckloth v. Bustamonte, supra, at 233 of 412 U.S., 93 S. Ct. 2041;[4] United States v. Jones, supra, at 728–731 of 475 F.2d; United States ex rel. Harris v. Hendricks, 423 F.2d 1096, 1099 (3rd Cir., 1970); United States v. Boukater, 409 F.2d 537, 538 (5th Cir., 1969); Phelper v. Decker, 401 F.2d 232, 238 (5th Cir., 1968).

 With these principles before us, we turn to the facts and circumstances surrounding the defendants' apprehension and the subsequent search of the 1971 Chrysler.[5] Defendant Horton was first asked if the agents could search the 1971 Chrysler when the taxi in which the suspects were riding was stopped near the entrance of the El Paso airport.[6] After driving from the airport to where the vehicle was located, Horton was again asked if he had any

4. We recognize that the defendant in *Schneckloth* was not in custody or under arrest at the time he gave consent to search, but the standard is no different where the defendant is under arrest or in custody.

5. Significantly, the consent was not obtained after an illegal arrest. For in such a case, the government would have the even more substantial burden of showing voluntariness untainted by an illegal arrest. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Bretti v. Wainwright, 439 F.2d 1042 at 1045; Agius v. United

States, 413 F.2d 915, 919–920 (5th Cir., 1969); Phelper v. Decker, supra, at 237–238 of 401 F.2d.

6. While Jordan may actually be the owner of the 1971 Chrysler, Horton is nevertheless authorized to give consent to search it. As Horton possessed the keys to the vehicle and represented that he was the owner, without objection from Jordan, it may be plausibly argued that Horton was a joint user of the automobile. Frazier v. Cupp, 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

objection to the search of the vehicle, and he replied that he had no objection.[7] Moreover, as the automobile was searched and the suspects' luggage was removed from the trunk, each person readily identified his or her luggage. More specifically, Horton identified the grey attache case where the three pounds, two ounces of heroin was found.

■ The arrest of the defendants was based on probable cause, and there is no indication in the record that the investigating officers used tactics that would augment the degree of the coercion that is inherent in any arrest. There is no evidence in the record of any intimidation, physical or psychological abuse, or threats tending to invalidate the consent. Although the suspects were not informed of their right to remain silent and that anything they said might be used against them, this is only one consideration in assessing voluntariness. In light of all the surrounding facts and circumstances, we are convinced that the consent was voluntary.

### III.

■ The final issue we must consider is whether there is sufficient evidence in the record to sustain the conviction of defendant Jordan. We recognize that all the evidence and reasonable inferences therefrom must be viewed in a light most favorable to the government. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Furthermore, in circumstantial evidence cases, the trier of fact must "reasonably find that the evidence excludes every reasonable hypothesis, except that of guilt." United States v. Sidan-Azzam, 457 F.2d 1309, 1310 (5th Cir., 1972). In measuring the sufficiency of evidence against this standard, "we must affirm any conclusion that could be reached by reasonable

minds." United States v. Squella-Avendano, 478 F.2d 433, 437 (5th Cir., 1973).

■ Because there is no evidence in the record demonstrating that Jordan was ever in actual possession of the heroin, the evidence must support a finding of constructive possession. Constructive possession has been defined as exercising dominion or control over the proscribed substance. United States v. Martin, 483 F.2d 974 (5th Cir., 1973); United States v. Stephenson, 474 F.2d 1353, 1355 (5th Cir., 1973); United States v. Mendoza, 433 F.2d 891, 896 (5th Cir., 1970); Garza v. United States, 385 F.2d 899, 901 (5th Cir., 1967).

■ The informant's first tip stated that Minnieweather would be accompanied by another black male, and the evidence in this case places Jordan in El Paso with Minnieweather during the first excursion to that city. It is well established that Jordan was with Horton during the period of the second trip to El Paso. But while the record demonstrates Jordan's proximity to the illegal substance and to the person who did have control over the heroin, we believe it is insufficient to sustain his conviction. In questioning at the customs office after their apprehension, Horton stated that he thought Jordan "knew what was going on." During this questioning Horton stated that the heroin was his, that it was purchased with his money, and that he was willing to take the blame for it. Jordan denied knowledge of the existence of the heroin or of any transactions involving drugs. As previously stated, the attache case containing the heroin belonged to Horton although it was found in Jordan's automobile. The case was locked and apparently only Horton had keys to open it. Furthermore, the evidence does not establish any type of "working relation-

7. In Robinson v. United States, 325 F.2d 880 (5th Cir., 1964), we were concerned with a search of defendant Robinson's automobile based upon consent. Prior to searching the vehicle, one of the investigating officers asked Robinson for the keys to the vehicle and stated that he wanted to search it. Without objection, Robinson gave the keys to the officer, and this court upheld the search based upon a valid consent. Id. at 884.

ship" between the parties regarding the heroin but merely an association. United States v. Stephenson, *supra,* at 1355 of 474 F.2d. We do not believe that control or dominion of the substance necessary to establish constructive possession is supported by this evidence. Therefore, Jordan cannot be held to have violated § 841(a)(1).[8]

Because the defendants did not move for a new trial in this case, we reverse and remand with instructions to enter a judgment of acquittal with respect to defendant Jordan. United States v. Restano, 449 F.2d 485, 488 (5th Cir., 1971); United States v. Musquiz, 445 F.2d 963, 966 (5th Cir., 1971). We affirm as to defendant Horton.

---

8. Jordan was not charged with conspiring to possess the heroin, 18 U.S.C.A. § 371 (1966), nor with aiding or abetting the offense of heroin possession, *id.* § 2(a).