**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Charles F. SMITH, Defendant-Appellant.**

**No. 75–4372.**

United States Court of Appeals, Fifth Circuit.

Dec. 13, 1976.

P. Nicholas Greenwood, Birmingham, Ala. (Court-appointed), for defendant-appellant.

Wayman G. Sherrer, U.S. Atty., James C. Thomason, III, Asst. U.S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before RIVES *, GEWIN and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

Charles F. Smith appeals his conviction for violation of 18 U.S.C. § 1708, unlawful possession of stolen mail.[1] He argues primarily that the district court erred in denying his motion to suppress evidence seized in the warrantless search of his car by police and a statement which Smith thereafter made to police. We affirm on the ground that Smith voluntarily consented to the search and voluntarily gave the statement after being informed of his *Miranda*[2] rights.

## I. FACTS

The district court held a pre-trial hearing on Smith's motion to suppress at which Detective Jack Hughes of the Anniston, Alabama Police Department and Smith testified. Hughes stated that early on the morning of May 24, 1975, an informant telephoned him and told him that Smith and Linda Vice[3] had possession of a stolen United States Treasury check for about $400; that Smith and Vice were at Vice's parents' house on Palmada Drive in Anniston; and that they were driving a dark 1963 Chrysler.[4]

Hughes and a Detective Ramey drove to the house and waited outside for 30 or 45 minutes. Smith and Vice came out and left in the Chrysler, with Smith driving. The officers followed them for five or six blocks and, at between 8:30 and 9:00 a. m., stopped them.[5]

The officers approached Smith, identified themselves as policemen, and asked Smith to produce his driver's license. As Smith did so, Hughes smelled alcohol on Smith's breath and asked how much he had had to drink. Smith replied that he had had a couple of cans of beer.

The officers took Smith into custody on suspicion of driving while intoxicated. Ramey drove Smith to the Anniston police station in the officers' car, while Hughes drove the Chrysler there with Vice as a passenger. At the station officers administered a photoelectric-intoximeter (PEI) test which indicated that, although Smith had been drinking, he was not legally intoxicated.

While Smith took the PEI test, the officers checked their records and found that Smith had not registered with the City of Anniston as a convicted felon. The officers arrested Smith on a city misdemeanor charge for failing to have done so. Hughes read Smith and Vice their *Miranda* rights.[6]

---

\* Judge Rives was a member of the panel that heard oral argument but due to illness did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d).

1.  Whoever buys, receives, or conceals, or unlawfully has in his possession, any letter, postal card, package, bag, or mail, or any article or thing contained therein, which has been so stolen, taken, embezzled, or abstracted, as herein described, knowing the same to have been stolen, taken, embezzled, or abstracted—
    Shall be fined not more than $2,000 or imprisoned not more than five years, or both.
    § 1708 also makes criminal the theft or destruction of mail.

2.  *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3.  Also referred to in the record by her name before marriage, Linda Goad.

4.  Hughes testified that the informant, whom he did not name, had given him information on

several prior occasions that was reliable and resulted in arrests; that the informant had never given him information that did not result in an arrest; that the informant was not under arrest or charges at the time he called; and that, to his knowledge, the informant had never been convicted of a felony. Record Vol. II at 6–8, 30–32.

5.  Hughes did not testify as to the reason for the stop. Smith, however, testified that Hughes told him he stopped him because his car was "weaving" down the road. Record Vol. II at 56.

6.  You have the right to talk to a lawyer and have him with you while you're being questioned. If you want a lawyer but cannot afford one the Court will appoint one for you. You have the right to remain silent. Anything you say can and may be used against you in Court.
    Record Vol. II at 15.

Both stated that they understood those rights.

The officers then told Smith and Vice that they were suspected of possessing a stolen Treasury check, which they denied. Hughes asked Smith if the Chrysler was his, and Smith answered that it was. Hughes asked whether Smith would give the officers permission to search the automobile. Either before or after he asked Smith this, Hughes completed blanks on a consent-to-search form for Smith's address, the officers' names, the property to be searched, its location, and the date and time.

Hughes testified that he told Smith the form was a "permit to search" Smith's car; that he read the completed form to Smith; that he handed the completed form to Smith, who looked it over; that he asked whether Smith understood what the form was; that Smith answered he did; and that Smith then signed the form.[7] Record Vol. II at 17–20, 38, 41–42. Hughes further testified that he did not tell Smith he had to "cooperate" with Hughes or that a search was "inevitable," nor did any officers make any threats or promises to Smith. Id. at 26–29. Hughes stated that Smith was not handcuffed at the police station,

although he may have been on the drive there. Id. at 27, 33–34.

Hughes also testified that he did not tell Smith he had the right not to consent to a search, although the consent form itself so states on its face. Note 7 supra. He said that Smith did not, at any time that morning, claim that he could not read.

After Smith signed the consent form he, Vice, Hughes, and Ramey went to the car, which had been parked behind the police station and locked. The officers unlocked it and found, in the glove compartment, nine pieces of mail addressed to Delores Nash, including a Treasury check for $444.24.

Hughes asked Smith whose mail it was. Smith replied that it was Vice's sister's or sister-in-law's, and Vice nodded her agreement. Hughes asked what the sister's or sister-in-law's name was. Almost simultaneously, Smith and Vice answered, "Delores Nash." As the four returned to the detective office, however, Vice changed her story and said that Delores Nash was not her sister or sister-in-law.

In the detective office Hughes telephoned Delores Nash and determined that the mail had been removed from her mailbox without her authorization. After questioning, Smith gave Hughes a statement. Hughes wrote it down, read it, and gave it to Smith to look over. Smith then signed it.[8]

---

7. The completed form (Government's Exhibit 1), with handwritten portions printed here in italics, reads as follows:

PERMISSION TO SEARCH

The undersigned, residing at *624 S. Colvin* does hereby voluntarily authorize *Dets. Hughes & Ramey*, and other officers he may designate to assist him, to search my residence (or other real property) located at *Police Station (Anniston, AL)* and my motor vehicle, namely my *1963 Chrysler* bearing license plate number *11–43899*, of the State of *Alabama*, presently parked or located at *Anniston Police Dept.* and I further authorize said officers to remove from my residence, real estate and/or motor vehicle, whatever documents, or items of property whatsoever which they deem pertinent to their investigation, with the understanding that said officers will give me a receipt for whatever is removed.

I am giving this written permission to these officers freely and voluntarily, without any threats or promises having been made, and

after having been informed by said officer that I have a right to refuse this search and/or seizure.

*Charles F. Smith*
Signature
Witnesses:
*J. Hughes*
DATE: *5/24/75*, 1975. Time *10:40 Am*.

8. Smith's statement, Record Vol. II at 113–14, was as follows:

On Thursday night, May 22nd, 1975, I went to Eastaboga, Alabama, and picked up a male friend, and we came back to Linda's father's house and picked her up. And the male friend told me to drive down to a trailer park near Oxford. I don't remember the name. We drove down there, and the male friend got out and went to a trailer and knocked on the door. Nobody answered. Then he went to a group of mail boxes and took some mail out of one of the boxes. He got back in the car and opened the mail and put it in the glove box of my car. We rode around and drank for a while. Then we carried the male

Although Smith's version of the morning's events generally tracked Hughes', it differed in certain critical particulars. Specifically, Smith testified that Hughes never arrested him on a failure-to-register charge and that Hughes obtained his consent to search by threatening to hold him and Vice until Hughes could obtain a search warrant.[9] Smith also said that he could not read or write more than his own name, and that he had so informed Hughes. Smith acknowledged, however, that he had understood the consent form gave Hughes permission to search his car; and that the signature on the form was his own.

After hearing this testimony the district court, ruling from the bench without on-the-record explanation, denied Smith's motion to suppress the mail seized and Smith's statement.[10] The jury found Smith guilty after a trial at which the mail and statement were admitted as evidence against him. The district court imposed a five year sentence, and Smith appeals.

## II. DISCUSSION

Because the district court did not enter findings of fact or conclusions of law following the pre-trial hearing, or indicate the legal theory on which it held the evidence admissible, we have "independently review[ed] the record to determine whether there is any reasonable view of the evidence that supports . . . admissibility." *United States v. Horton,* 488 F.2d 374, 380 (5th Cir.1973), *cert. denied,* 416 U.S. 993, 94

S.Ct. 2405, 40 L.Ed.2d 772 (1974), *citing United States v. Montos,* 421 F.2d 215, 219 n.1 (5th Cir.), *cert. denied,* 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970).[11] Because credibility determinations are for the trial court, we assume that the district court accepted Hughes' version where it conflicted with Smith's. *United States v. Montos, supra,* 421 F.2d at 219 n.1. We conclude that the evidence obtained in the search was admissible on the theory that Smith voluntarily consented to the search,[12] and that the statement was admissible on the theory that Smith gave it voluntarily after being fully apprised of his *Miranda* rights.

A. Voluntariness of the consent to search. "When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). Voluntariness "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). The government's evidence of voluntariness here was strong. Smith was informed of his *Miranda* rights and the object of the search before he consented. No one made any threats or promises to him. No one told him he had to consent. He signed the consent form understanding its contents.

In arguing that the government did not meet its burden of showing voluntari-

friend home. I didn't know he left the mail in my car.

9. Hughes had testified that Smith would not have been free to leave at the time of his consent in any event, because he was already under arrest. Record Vol. II at 39.

10. The court granted the motion of Vice, who had also been indicted, to suppress her statements, and it dismissed the indictment against her on the government's motion.

11. As we have stated before, "It would have been better practice for the court to enter findings of fact and conclusions of law after the suppression hearing. [cite] If such findings had been made, we would be required to accept them unless they were clearly erroneous.

[cite]" *United States v. Jones,* 475 F.2d 723, 728 n.3 (5th Cir.), *cert. denied,* 414 U.S. 841, 94 S.Ct. 96, 38 L.Ed.2d 77 (1973). Such findings are, however, discretionary with the trial court. *United States v. Horton, supra,* 488 F.2d at 380.

12. We therefore do not consider whether the warrantless search of Smith's car was justifiable as based on probable cause derived from the informant's tip, *see Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), or as an inventory search, *see South Dakota v. Opperman,* — U.S. —, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

ness, Smith emphasizes the facts that he was in custody at the police station when he signed the consent form and that Hughes did not tell him he had the right not to consent.[13] While these facts must be taken into account in deciding whether Smith's consent was voluntary, they are not determinative.

In *Schneckloth v. Bustamonte, supra,* the Supreme Court held that where a person was not under arrest or in custody when he allegedly consented to a search, the failure of police to inform him of his right not to consent was insufficient to render the consent involuntary as a matter of law. In *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), the Court held the same was true where a person had been legally arrested, informed of his *Miranda* rights, and was in police custody (but "not in the confines of the police station") at the time of his alleged consent. 423 U.S. at 424, 96 S.Ct. at 828, 46 L.Ed.2d at 609. Although custody and failure to inform of the right to refuse "may be . . . factor[s] in the overall judgment," the Court said, they were "not to be given controlling significance." *Id.*[14]

The fact that Smith gave his consent when he was in custody *at the police station,* while another "factor in the overall judgment," does not justify a departure from the "totality of the circumstances" approach established in *Schneckloth* and *Watson.* This case simply does not raise "the spector of incommunicado police interrogation in some remote station house" al-

luded to in *Schneckloth, supra,* 412 U.S. at 247, 93 S.Ct. at 2058. Because Smith was told he had the right to consult an attorney, note 6 *supra,* it can hardly be said he was held "incommunicado." At most, little more than two hours elapsed between the time Hughes and Ramey first stopped Smith and the time Smith signed the consent form.[15] Little, if any, questioning took place before Hughes asked Smith whether he would consent to a search. The stationhouse atmosphere here was not so "inherently coercive" as to require specific *Miranda*-like fourth amendment warnings before a valid consent could be obtained. *See Leavitt v. Howard,* 462 F.2d 992 (1st Cir.), *cert. denied,* 409 U.S. 884, 93 S.Ct. 175, 34 L.Ed.2d 140 (1972) (upholding state court finding that consent to search car, given in police headquarters after arrest, was voluntary); *United States v. Manar,* 454 F.2d 342 (7th Cir.1971) (upholding finding that consent to search personal possessions, given in jail after arrest, was voluntary); *Virgin Islands v. Berne,* 412 F.2d 1055 (3d Cir.), *cert. denied,* 396 U.S. 837, 90 S.Ct. 96, 24 L.Ed.2d 87 (1969) (upholding finding that consent to search car, given in police station after arrest, was voluntary); *Gorman v. United States,* 380 F.2d 158 (1st Cir.1967) (upholding finding that consent to search motel room, given at police station after arrest, was voluntary); *cf. United States v. Fike,* 449 F.2d 191 (5th Cir.1971) (upholding finding that consent to search car, given while in custody at sheriff's office with knowledge of right to refuse, was voluntary).

---

**13.** Hughes' testimony that he read the consent form to Smith, Record Vol. II at 38, appears inconsistent with his testimony that he did not tell Smith he had the right not to consent, since the consent form itself states the right. Note 7 *supra.* This inconsistency, together with Smith's testimony that he was unable to read the consent form himself, leads us to assume that Smith was not informed of his right not to consent.

**14.** This circuit anticipated *Watson*'s refusal to distinguish, as a matter of law, custodial from noncustodial consents obtained without warnings of the right not to consent. *United States v. Garcia,* 496 F.2d 670, 673 (5th Cir.1974), *cert.*

denied, 420 U.S. 960, 95 S.Ct. 1347, 43 L.Ed.2d 436 (1975); *United States v. Horton,* 488 F.2d 374, 380 n.4 (5th Cir.1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974); *United States v. Luton,* 486 F.2d 1021, 1023 (5th Cir.1973), *cert. denied,* 417 U.S. 920, 94 S.Ct. 2626, 41 L.Ed.2d 225 (1974); *United States v. Legato,* 480 F.2d 408, 413 (5th Cir.), *cert. denied,* 414 U.S. 979, 94 S.Ct. 295, 38 L.Ed.2d 223 (1973); *United States v. Canseco,* 465 F.2d 383, 385 (5th Cir.1972).

**15.** Hughes and Ramey stopped Smith between 8:30 and 9:00 a. m. Text at note 5 *supra.* The consent form was signed at 10:40 a. m. Note 7 *supra.*

■ Although Smith asserts that the initial stop, the arrest on suspicion of driving while intoxicated, and the arrest for failing to register were all a ruse to pressure him into consenting to a search, he does not seriously challenge the legality of any of those actions.[16] Thus we are not faced with the question whether an illegal arrest "tainted" a subsequent consent. *See, e. g., Bretti v. Wainwright,* 439 F.2d 1042, 1045–46 (5th Cir.), *cert. denied,* 404 U.S. 943, 92 S.Ct. 293, 30 L.Ed.2d 257 (1971); *Phelper v. Decker,* 401 F.2d 232, 235–38 (5th Cir.1968). The officers were not required to tell Smith the moment they stopped him that they suspected he possessed a stolen Treasury check; what matters is that they told him before he consented to the search. *See United States v. Bailey,* 447 F.2d 735, 737–38 (5th Cir.1971), *distinguishing Alexander v. United States,* 390 F.2d 101 (5th Cir. 1968). We hold that a reasonable view of all the facts in this case supports the conclusion that Smith voluntarily consented to the search of his car.

B. Admissibility of the statement. The same evidence which demonstrates the voluntariness of Smith's consent also demonstrates the voluntariness of his statement. *Schneckloth v. Bustamonte,* 412 U.S. 218, 223–28, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Smith was informed of his *Miranda* rights and understood them before he made his statement. The district court did not err in holding that he validly waived those rights and that the statement was voluntary.

■ C. Other issues. The indictment upon which Smith was tried was signed by the Assistant United States Attorney as required by Fed.R.Crim.Pro. 7(c). Record Vol. I at 2. The district court did not err in refusing to dismiss the indictment because the copy served on Smith at the arraignment, Fed.R.Crim.Pro. 10, was a photocopy made before the Assistant signed the original. No prejudice occurred. Likewise, the district court did not err in refusing to dismiss the indictment because it charged in the conjunctive while the statute is written in the disjunctive. "[W]here a statute . . . specifies several alternative ways in which an offense may be committed, an indictment may allege the several alternative means of commission of the offense in the conjunctive." *United States v. Miller,* 491 F.2d 638, 648 (5th Cir.), *cert. denied,* 419 U.S. 970, 95 S.Ct. 236, 42 L.Ed.2d 186 (1974).

The district court correctly instructed the jury on possession and intent. A review of the record convinces us that the evidence was sufficient, and we affirm.

AFFIRMED.

16. As we have noted, there was some evidence that Hughes stopped Smith initially because Smith's car was "weaving." Note 5 *supra.* In any event, whether or not the informant's tip established probable cause, it surely established the reasonable suspicion required for a brief stop to ascertain identity. *Adams v. Williams,* 407 U.S. 143, 145–47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Johnson v. Wright,* 509 F.2d 828, 829 (5th Cir.), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 445, 46 L.Ed.2d 384 (1975); *United States v. Rollerson,* 491 F.2d 1209, 1211–12 (5th Cir.1974); *see United States v. Brignoni-Ponce,* 422 U.S. 873, 878–82, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

Of course, Hughes acted properly when, smelling alcohol on Smith's breath, he took Smith into custody on suspicion of driving while intoxicated. Smith did not raise an issue below as to the legality of the arrest for failure to register as a convicted felon; hence neither side presented evidence going to the basis for this arrest, beyond Hughes' testimony that police checked their records and found Smith had not registered. We note, though, that the record from sentencing shows Smith had a long string of prior convictions which the trial court considered "quite serious." Record Vol. II at 154–59. There were also indications that Smith was no stranger to Anniston or its police and that Smith had returned to Anniston following his release from prison. *Id.* at 8, 13, 15, 32.