Burglary, first degree; sentence; forty years.
Curtis Gene Behel was arrested on May 24, 1978, at his trailer. An investigation by law enforcement officers had revealed that his description was similar to the description given by the victim who had been raped after a burglar had broken into her trailer.
Behel was indicted by the Lauderdale County Grand Jury and charged with burglary in the first degree with intent to rape. He was represented by an attorney at his arraignment where he pleaded not guilty and not guilty by reason of insanity. After trial by jury he was found guilty and later sentenced. The appellant was provided with a free transcript and is represented by appointed counsel on appeal.
On May 23, 1978, the victim lived in the Green Hill community of Florence, Alabama with her husband and a three-year-old son. At approximately 11:20 P.M., after she had locked the doors to the house, she went to bed. Her husband was working at Reynolds and Company and usually arrived home between 12:30 and 12:45 A.M.
She recalled that after she had gone to bed someone grabbed her by the shoulders and told her to "get up." She explained: "First I thought it was my husband and maybe something was wrong and I kept saying `what is wrong?' and he kept telling me to get up and I turned over to see what was wrong and I saw a man with a stocking over his head." She testified that the man had a knife in his hand and told her if she screamed he would kill her and her son.
According to the victim, the man dragged her from the bed to the back door of the trailer. She explained that the man had her right arm pinned behind her and had placed a knife at her throat. She became aware of the knife when the man attempted to unlock the back door. Describing the knife, she testified that the blade "wasn't very long," and that he was holding it to her throat.
While her assailant was trying to unlock the back door, the victim managed to get away. She stated that she ran to the bedroom and turned on the light, but he "flipped it off and hit me in the face." Her nose began to bleed and she started crying and screaming. The man grabbed her and pulled her toward the back door. She recalled that, at that point, he threatened to kill both her and her son.
According to the witness, the man unlocked the back door, shoved her down the back steps, and dragged her into a wooded area beside the trailer. She described the wooded area as consisting of nothing but trees and "saw-briars and vines" and testified that her assailant kept "shoving me *Page 664 
through it until a clearing on the other side."
After reaching the clearing, she asked the man what he was going to do. According to the witness, he replied "that he had been in prison for two years and that my husband had got his wife on dope and that he was out to revenge him and I asked him why he had me instead of him and he said he would get him later." At that point, the man had sexual intercourse with the victim against her will. She testified that she could see and feel the assailant's mustache when he pulled the stocking over the top of his nose and forcibly kissed her.
After the attack, the victim ran to her trailer and checked on her son. In a few minutes her husband arrived home. She stated that she informed her husband of the attack and told him to call the police.
Rick Singleton, a deputy sheriff, arrived at the trailer and talked with the victim. The victim recalled that she told the officer her attacker wore boots, bluejeans and a plaid shirt. Subsequent to the interview with the deputy, she went first to the hospital, then to the sheriff's department where Bill Price made photographs of her. The victim testified that, while in Bill Price's office, she overheard a voice "from the opposite room next to us," and recognized the voice as being that of the man who had raped her.
During the trial, she identified a number of photographs, some being the photographs showing her physical appearance immediately after the assault. Also, there were photographs indicating that the front door of the trailer had been pried open. The victim identified photographs of the appellant's trailer and stated that his trailer was located directly across the street from the trailer in which she and her family lived.
During cross-examination, she described her attacker as being "about Mike Jemison's height." [Mike Jemison was the State Trooper who investigated the offense.] Further, she informed the officer that the man who had attacked her was taller than her husband, who was five feet nine inches in height. She said her attacker had a mustache which was lighter in color than that of Deputy Lanny Jackson. She explained that the man who had attacked her was not as heavy as Sgt. Mike Jemison but that her assailant appeared to be a "pretty good sized man." During further questioning, she stated that she detected the smell of alcoholic beverages on her attacker's breath.
Rick Singleton, a deputy sheriff of Lauderdale County, recalled that on May 24, 1978, the victim and her husband came to the sheriff's office. He testified that he was in the room with the victim and her husband while Deputy Bill Price was interviewing the appellant, Curtis Gene Behel, in the next room. Singleton said that he could hear the appellant's voice and according to Singleton's testimony, when the victim first heard the appellant speak, "She just looked up and just a few seconds later when he began talking a little bit, she looked at me and said, `that's him.'"
During cross-examination, Singleton acknowledged that, between 12:30 and 12:40 A.M., he received a call to report to victim's residence. He and Deputy Dwight Angel arrived there some seven minutes later. The witness admitted that the victim was very upset emotionally and was crying. According to Singleton, the victim described her attacker as being taller than her husband and having a mustache. She told Singleton that the attacker wore bluejeans and a plaid shirt, and had a stocking over his face. Singleton recalled that Deputy Jackson arrived later, as did State Trooper Mike Jemison and other law enforcement personnel.
Doctor Andrew David Jamieson testified that he examined the victim and said that a vaginal wash showed "active swimming motiles spermatozoa present."
Deputy Dwight Angel testified that he and Bill Hendrix, a St. Florian Police Officer, went to Behel's trailer at approximately 1:30 A.M. Upon their arrival, the appellant invited the officers inside his home. Hendrix informed Behel of a problem at the victim's residence and "asked him if he had *Page 665 
heard things or was aware of anything next door." According to Angel, appellant said, "the only thing he had heard was around 10:30 or 11:00 he had heard a car go by, and since that time he had been asleep and he hadn't noticed any problem as far as that goes." Deputy Angel recalled that the shower was wet, and small puddles of water were on the floor, and that a wet towel was on the sink.
During cross-examination, Angel acknowledged that he never saw any cowboy boots anywhere in the trailer, nor did he see any pantyhose or stockings.
Sgt. Mike Jemison, an Alabama State Trooper, testified that two sets of footprints were found leading from the victim's back yard into a swampy area "dense with briars and thickets." One set of prints was of a person wearing boots "and the other one seemed to be barefooted." The boot footprints were traced from the scene of the rape across a field to the road. Jemison testified: (Tr. p. 231)
 "We found one piece of mud on the road and it was just smeared into the road. . . . The grass was real wet and it was about a little over knee high all up and down the road."
According to Jemison, they found no evidence that a vehicle had been used by the suspect. The witness stated; "We could find no place on the road where any vehicle had pulled off."
Jemison recalled that between 3:30 and 4:00 A.M., he and Deputy Jackson went to the appellant's trailer and knocked on the door. When the appellant asked "Who is it?" Jemison identified himself and said that he needed to talk with him [the appellant]. Jemison described appellant's dress as "a pair of jockey shorts underwear and a sheet wrapped around him." He said that the appellant, who had been drinking, invited the officers to come in.
Jemison testified that he sat on the couch next to the appellant and informed him that he was a suspect in the rape of the victim. Jemison explained to Behel that this determination was based on previously gathered information, including the description given by the victim. At that point, Jemison told the appellant that his rights should be read to him because Jemison "felt like he [appellant] was a suspect."
According to Jemison, Behel was immediately given his Miranda
warnings and was not promised any reward nor threatened in any manner. After his rights were explained to the appellant, he responded that he understood them and told the officers he would talk with them.
From the record:
"Q. All right, what happened next, if you recall?
 "A. At that time I asked him if he had any weapons, any guns or knives, in the house, that I didn't want him to hurt me or me have to hurt him and he said, `Yes, sir, I have a knife right there on the table.'
"Q. Did he point to it?
 "A. Yes, sir, it was setting on the coffee table in front of us.
"Q. Al right, then what was said next?
 "A. I asked him if there was anybody else in the trailer and he told me `no,' his wife and him were separated and she had been gone for about two weeks and he was living by himself.
 "Q. Well, did you see anybody else there in the trailer that night?
"A. No, sir, I did not.
 "Q. All right, after that what did you do next, Sgt. Jemison?
 "A. Either myself or Deputy Jackson, I'm not sure which one asked, one of us asked him did he own a pair of cowboy boots, and he said `yes' and pointed down the hall to our right, which he was on my left and he pointed across me and said, `They're down in the bedroom.' And I turned around and looked and you could see them setting in the bedroom. Right at that same point and time I asked him if he minded us looking around and he told us, `No, I don't have anything to hide. You can look for anything you want to.' And I believe then was when I asked him about the cowboy boots and he said, `right down here.' And Deputy *Page 666 
Jackson walked down and picked them up and brought them back up where we were.
 "Q. All right, did you examine the boots at that time?
"A. Yes, sir, I did.
. . . . .
 "A. The boots were solid water inside and out. The soles, where the soles meet the leather, there was mud inside the-on the edge of the soles of the boots and like I said there was water actually inside the boots.
"Q. They appeared to be freshly washed?
"A. Yes, sir.
 "Q. All right, after you saw the boots and examined them and found them to be in that condition, what did you do next, Sgt. Jemison?
 "A. I took the boots and laid them on top of the table in the kitchen. I set them on top of the table and came back over and asked Curtis if he minded if we searched the rest of the house.
 "Q. In other words, you asked him for permission to search the house?
"A. Yes, sir.
"Q. And what did he say at that time?
"A. He said, `Go ahead and search for anything.'
"Q. He gave you permission to search the house?
"A. Yes, sir.
"Q. Then, what did y'all do?
 "A. I talked to him about where he had been and how long he had been home and that type thing while Deputy Jackson walked back and looked through the bedrooms and the bathroom and all. Deputy Jackson called me back to the bedroom and I walked back there and he lifted up the mattress and between the mattress and the springs was a pair of bluejeans.
 "Q. All right, did you examine the blue jeans at that time?
. . . . .
 "A. The bluejeans were wet from above the knees all the way to the bottom of them. There was mud all over the legs and the knees especially had mud all over them and they were real wet.
. . . . .
 "Q. All right, what else did you find on that occasion?
"A. A plaid shirt.
"Q. Anything else besides the plaid shirt?
. . . . .
"A. As we were leaving we found a pair of pantyhose.
"Q. And where did you find those?
"A. Under the cushions on the couch.
"Q. Is that the couch that he was sitting on?
 "A. Yes, sir, the couch both of us were sitting on when we found them."
During cross-examination, Jemison was asked:
 "Q. All right, now, he cooperated with you in every way in this investigation, didn't he?
"A. He didn't give me any trouble at all.
 "Q. And he gave you the consents that you have already testified about?
"A. Yes, sir.
 "Q. Now, did you ever explain to him, or did you explain or did Mr. Jackson explain anything to him about the fact that he could require a Search Warrant for the search of his trailer?
"A. No, sir, I didn't.
 "Q. Did he give you any permission to remove any of the items from his trailer?
"A. No, sir, I didn't ask for it.
 "Q. But you did take and remove all those items that you mentioned finding that in your mind were connected with the case?
"A. Yes, sir, that's right."
Sgt. Jemison said all the items that he had taken from the appellant's residence were later turned over to Bill Price.
Bill Price, Chief Investigator for the Lauderdale County Sheriff's Department, testified that during an examination of the victim's trailer he "found the front door to be damaged and the door jam to be damaged." *Page 667 
Further, he said "there were some jimmy marks on the front door." During the trial, he identified photographs of the door depicting what he had described in his oral testimony.
Price testified that the items turned over to him by Sgt. Jemison and, a blood sample from the appellant were taken to the receptionist at the crime lab. Officer Price also stated that the appellant did not have any scratches on his hands or on any part of his body.
John Kilbourn, State Toxicologist, testified that he examined the items turned over to the crime lab by Officer Price. On the knife he found a small quantity of soil, but he did not perform any test on the boots. Kilbourn said that he noted on the bluejeans the presence of foreign material which included soil and bloodstains. He made "a cutting" of the bluejeans, then sent them to Bill Landrum.
Kilbourn testified that blood samples taken from the appellant and from the victim, as well as saliva samples, were sent to Mr. Landrum. During cross-examination, Mr. Kilbourn admitted that he had found no blood on the knife and that he had found no briars nor green plant substance on the bluejeans.
Kilbourn testified that none of the tests made on the pantyhose revealed any hair belonging to Behel. Also, the comparison test with the pubic hairs from the bodies of the appellant and the victim was negative.
William H. Landrum, a criminalist forensic serologist with the Department of Toxicology and Criminal Investigation, stated that he conducted tests on blood samples taken from the appellant and from the victim. He testified that the blood type from samples on the appellant's pants matched the blood type determined from the sample taken from the victim.
During cross-examination, Landrum acknowledged that approximately twelve percent of the white population has the same blood type as that of the victim. Further, he said that he had not been furnished with any blood samples from any of the appellant's family and could not say that the blood sample turned over to him originally came from the victim.
At the conclusion of Landrum's testimony, the State rested its case. Counsel for the defense submitted a motion to suppress, along with a motion to exclude and a motion to dismiss. After the motions were overruled, the appellant called the following witnesses.
Warren Stewart, a radio dispatcher for the Lauderdale County Jail, testified that, on May 23 and 24, 1978, he made entries in a record giving the time period he was on duty and the calls and messages that had come in during that time period. He acknowledged that at 1:07 A.M., on the day in question, he received a communication regarding the case being tried. The communication identified the suspect as a "white male, 5'10", stocky build with a dark mustache."
During cross-examination, Stewart admitted that he could not identify the source of the message, but added it was not the victim.
Sheldon Carroll testified that he owned and operated the "43 Lounge in Tennessee." He recalled seeing the appellant at his place of business on Tuesday night, May 23, 1978. The witness stated that the appellant was there just prior to closing at 11:45 P.M.
Judy Corn testified that on the night in question she had worked at the "43 Lounge," where she remembered seeing the appellant. According to Corn, she locked the door of the lounge at 12:00 o'clock. She acknowledged seeing the appellant on the premises at the time the front door was being locked. She testified that he was standing outside the door talking to Sharon and Jimmy Black and was wearing a "short-sleeved, red checked shirt" and trousers that were "a light color, either-they were either a Levi type or a khaki color. . . ."
Sharon Black testified that she had met Behel, whom she knew, at the "43 Lounge" on the night of May 23, 1978. She stated that her husband and the appellant had a *Page 668 
conversation outside the lounge during the early morning hours of May 24, 1978. According to Black, in her best judgment she and her husband left the parking lot of the lounge about five or ten minutes after twelve o'clock.
During cross-examination, Black admitted that the appellant and her husband were good friends whose families once farmed together. Further, she acknowledged that she and her husband lived about four miles from the appellant. She stated that in her best judgment, the drive from the "43 Lounge" to appellant's home would take about fifteen minutes.
Felton Ray Jones testified that he had seen the appellant at the "43 Lounge" on the night of May 23, 1978, and that appellant was wearing a loudly colored shirt and light pants. Also, he stated that, when he left at approximately 12:15 A.M., appellant was still in the parking lot of the lounge.
Nina Reed testified that she was working at the "43 Lounge" on the night in question. She last saw the appellant that night at 11:25.
Tommy W. Morgan, a medical technologist at the Shoals Medical Lab in Florence, Alabama, testified that an examination of a blood specimen taken from the appellant's wife revealed her blood type was group A, RH positive. He stated that he was familiar with blood classification as AM, but his facilities were not "set up [to] further break the group test down to that classification." He could not verify that the blood test taken from appellant's wife had or did not have the "M factor."
At the end of Morgan's testimony, counsel for appellant moved to continue the case until the following day because the appellant was not present and an opportunity to find the appellant was needed. The defense counsel explained that they intended to present the appellant as a witness on his own behalf. The court, at that time said, "In view of the fact that we have been searching for him all day and have had the sheriff looking for him and his efforts have failed and since the jury is sequestered we deny your motion."
 I
The appellant contends that consent to search his trailer was not knowingly and intelligently given; therefore, all the evidence submitted as a result of that search should be suppressed.
In Barclay v. State, Ala.Cr.App., 368 So.2d 579, this court considered the question of whether a proper consent may constitute a waiver of Fourth Amendment rights, such waiver making a search warrant unnecessary. There the court said:
 ". . . Proper consent may constitute a waiver of Fourth Amendment rights, Zapp v. United States, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946), and makes a search warrant wholly unnecessary. Toston v. State, 333 So.2d 161 (Ala.Cr.App. 1976). The voluntariness of consent to search is a question of fact to be determined from the totality of all the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); United States v. Smith, 543 F.2d 1141 (5th Cir. 1976).
 "The failure to inform the accused of his right to refuse is a factor to consider in determining voluntariness but is not to be given controlling significance. United States v. Smith, 543 F.2d 1141, 1143 (5th Cir. 1976). `While the knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.' Schneckloth, 412 U.S., at 227, 93 S.Ct. at 2048. The burden of proving that the consent was, in fact, freely and voluntarily given rests upon the prosecution. Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). `The State must prove that there was no duress or coercion express or implied. The consent must be unequivocal and specific, and freely and intelligently given. There must be clear and positive testimony.' Hardy v. State, 53 Ala. App. 75, 78, 297 So.2d 399, 402
(1974)."
The United States Court of Appeals (5th Cir.) in UnitedStates v. Jones, 475 F.2d 723, *Page 669 
recognized that Miranda warnings given prior to permission to search were properly considered as a circumstance in determining whether consent was freely given, even though such warnings would not insulate the prosecution from claims that the consent was coercively obtained.
The cases cited to this court in support of appellant's contention are clearly distinguishable. Those cases were Bumperv. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797;Henderson v. State, 49 Ala. App. 275, 270 So.2d 822; Hardy v.State, 53 Ala. App. 75, 297 So.2d 399, and Perkins v. Henderson, 5th Cir., 418 F.2d 441.
In the instant case, the appellant was given Miranda warnings by Sgt. Jemison shortly after the appellant let the officers into his trailer. Throughout Sgt. Jemison's testimony, the permission by appellant to search his trailer is emphasized. Although the officers did not explain to the appellant that he had a right to refuse permission to search without a search warrant, the voluntariness of appellant's permission was indicated when he said to the officers "go ahead and search for anything, I don't have anything to hide."
After an examination of the total circumstances, we are of the opinion that the testimony of Troopers Jemison and Jackson sufficiently established that appellant's consent to search was voluntarily given after he had been advised of his constitutional rights. Therefore, it is our judgment that the motion to suppress was properly denied and that the items seized were properly introduced into evidence.
 II
The appellant insists that the trial court committed reversible error by "receiving the jury verdict and having it announced in a capital felony without the defendant being present. . . ." Counsel argues, "to receive the verdict not only reversible error but also puts the defendant in jeopardy and he is entitled to be discharged on the charge for which the verdict is received."
In Berness v. State, 263 Ala. 641, 83 So.2d 613, the Supreme Court of Alabama, when considering the method by which an appellant's clear and unequivocal right to be present at every stage of his trial may be waived, said:
 "We are of the opinion that a criminal defendant in a non-capital felony case may waive his continuous presence at the trial. But that this waiver must be of an affirmative and positive nature and made by him personally, as for example when he voluntarily absents himself from the courtroom during the conduct of his trial. Our holding that such conduct constitutes an affirmative and voluntary waiver of the constitutional right, personal to the defendant, is consistent with the holding in McNutt v. State, 25 Ala. App. 129, 142 So. 773."
See also, Dixon v. State, Ala.Cr.App., 357 So.2d 690.
In the present case, the record clearly shows that the appellant's absence from court was of his own choosing.
"THURSDAY, SEPTEMBER 21, 1978
 "THE COURT: WE AGAIN CALL THE BEHEL CASE, AND MR. HOLT, BRING YOUR CLIENT AROUND.
 "MR. HOLT: MAY I PLEASE THE COURT, THE DEFENDANT HAS NOT YET APPEARED HERE IN COURT THIS MORNING AND WE MOVE FOR A CONTINUANCE OR FOR A DEFERRING OF THE RECONVENING OF THE TRIAL UNTIL HE ARRIVES IN COURT.
 "THE COURT: ALL RIGHT, IT IS NOW A QUARTER UNTIL TEN AND THE CASE WAS SET FOR 9 O'CLOCK THIS MORNING AND FROM CONFERENCE WITH YOU AND WITH THE DEFENDANT'S FATHER AND WITH MR. WALKER EARLIER, IT IS MY UNDERSTANDING THAT DEFENDANT'S WIFE HAS CALLED ONE OF THE ATTORNEYS AND STATED THAT MR. BEHEL WOULD NOT BE COMING TO COURT THIS MORNING, THAT HE SAID HE WAS LEAVING *Page 670 
OR WORDS TO THAT EFFECT. IS THAT YOUR INFORMATION AT THIS POINT?
 "MR. HOLT: THAT WAS WHAT MR. WALKER RELATED TO ME. I DID NOT RECEIVE THE PHONE CALL AND DID NOT TALK PERSONALLY WITH THE DEFENDANT'S WIFE.
 "THE COURT: DO YOU HAVE ANY INFORMATION OTHER THAN THAT AS TO HIS ABSENCE?
 "MR. HOLT: NO, SIR, MAY I PLEASE, THE COURT, EVERYTHING THAT WE HAD ANY DIRECT OR HEARSAY KNOWLEDGE ABOUT-WELL, EVERYTHING WE HAD WAS HEARSAY, BUT EVERYTHING WE HAD IN THE WAY OF INFORMATION WAS RELATED TO THE COURT BEFORE 9 O'CLOCK THIS MORNING IMMEDIATELY UPON IT HAVING BEEN CONVEYED TO US.
 "THE COURT: AND THAT IS IN SUBSTANCE WHAT I HAVE RELATED FOR THE RECORD.
"MR. HOLT: YES, IT IS.
 "THE COURT: WELL, WE WILL CONTINUE WITH THE CASE AT THIS POINT.
 "MR. HOLT: WE OBJECT TO THE CASE CONTINUING AT THIS TIME AND THE ALTERNATIVE TO A MOTION FOR A CONTINUANCE OR A DELAY IN THE RECONVENING OF THE TRIAL. WE MOVE FOR A MISTRIAL ON THE GROUNDS THAT THE DEFENDANT IS NOT HERE, FOR WHAT REASON I DON'T KNOW OTHER THAN WHAT I'VE STATED AS CANDIDLY AS I KNOW HOW TO THE COURT AND WITHOUT THE DEFENDANT HERE, I'M COMPLETELY HANDICAPPED AS FAR AS PRESENTING ANY KIND OF A DEFENSE, IF ONE IS AVAILABLE ON HIS BEHALF.
 "THE COURT: ALL RIGHT, IT'S MY UNDERSTANDING NOW THAT MR. WALKER AND MR. BEHEL'S FATHER HAVE GONE ON TO SEARCH FOR HIM, IS THAT CORRECT?
"MR. HOLT: YES, SIR.
"THE COURT: ALL RIGHT, THE MOTION IS OVERRULED.
"MR. HOLT: WE EXCEPT."
Clearly, the appellant voluntarily absented himself from the courtroom; therefore, it is our judgment that the defendant waived his right to be in court. Berness v. State, supra. Also under the circumstances of the present case, the appellant's argument that first degree burglary is a capital felony is not supported.
 III
The appellant maintains that his sentence of forty years was illegal, improper and unauthorized by the law. He argues that under the Code of Alabama 1975, §§ 13-2-40 and 13-11-2 (a)(4), the only punishment provided for first degree burglary is either ten years "or the death penalty when a homicide is committed during the commission of the burglary in the first degree."
Code of Alabama 1975, § 13-2-40 provides:
"§ 13-2-40. First degree.
 "Any person who, in the nighttime, with intent to steal or to commit a felony, breaks into and enters any inhabited dwelling house, or any other house or building, which is occupied by any person lodged therein is guilty of burglary in the first degree, and shall, on conviction, be punished, by imprisonment in the penitentiary for not less than 10 years, or as otherwise specified by law. (Code 1852, § 149; Code 1867, § 3695; Code 1876, § 4343; Code 1886, § 3786; Code 1896, § 4417; Code 1907, § 6415; Code 1923, § 3479; Acts 1935, No. 100 p. 159; Code 1940, T. 14, § 85.)"
In the instant case the defendant was sentenced to forty years imprisonment. There is no provision in the statute giving a maximum number of years. The court was limited by statute to only a minimum of ten years. The court was limited only by its own discretion in assessing the maximum sentence for the appellant. Therefore, we *Page 671 
hold the sentence is proper and is within the purview of § 13-2-40.
After a careful search of the record, we have found no error prejudicial to the appellant's rights. Under the facts presented, the evidence was sufficient to justify the verdict; therefore, the judgment of conviction by the Lauderdale Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.