The indictment charged Robert Thomas Dixon with the robbery of Tucker Smith by feloniously taking some $75.00 from his person and against his will by putting him in fear, etc. The jury found the appellant "guilty of robbery as charged" and fixed punishment at ten years imprisonment. The trial court set sentence accordingly and overruled the appellant's motion for new trial, which challenged the weight and sufficiency of the evidence.
Tucker Smith testified that on March 26, 1976, he was employed at Banjo Grocery on Lomb Avenue in the southwest section of the City of Birmingham. Shortly after 8:00 o'clock that morning, about seven or eight customers were in the store. A young black male approached the cashier's counter with two bottles of Champale. As Mr. Smith attempted to ring up the sale, the robber, whom he positively identified in court as being the appellant, pointed a sawed-off shotgun at him and demanded the proceeds from the cash register. Mr. Smith stated that he placed $75.00 in United States currency in a paper bag and laid it on the counter. Mr. Smith and the customers *Page 692 
inside the store were then directed to lie down on the floor. The robber then backed out of the store with his weapon in his hand. Mr. Smith described the shotgun as being either a twelve or sixteen gauge, sawed-off, the barrel only six to eight inches long, and the "whole thing about fifteen to twenty inches long" (R. p. 41).
Mr. Smith revealed that when the bills are pulled from the cash register in a certain manner an alarm goes off at Police Headquarters, and in minutes Birmingham police officers arrived at the scene. Smith gave a description of the appellant as being a black male, clean shaven, between five feet eight inches and five feet ten inches tall, and weighing approximately 165 to 170 pounds. Mr. Smith stated that he pointed out to the officers the two beer bottles which the appellant had brought to the counter.
Mr. Smith stated that on the same day of the robbery he had pointed out the appellant from some photographs shown to him by Police Sergeant Carreker. Mr. Smith testified that he attended a lineup on either April 13 or 14, 1976, but his pretrial identification was from photographs.
B.A. Lorina stated that he sold beer for Supreme Beverage in Birmingham on March 26, 1976. He stated that shortly after 8:00 on the morning in question he and his helper were placing beer inside Banjo Grocery at 1600 Lomb Avenue. He indicated that they were in the back of the store when they heard someone say, "Come here," and as he turned he saw a sawed-off shotgun being held by a black male. The robber directed Mr. Lorina to place his money in a paper bag, then lie down on the floor next to Mr. Tucker Smith. Mr. Lorina stated that he and his helper did so, but he was unable to identify the robber.
Manuel Ezell testified that he was in Banjo Grocery shortly after 8:00 o'clock in the morning on March 26, 1976. He stated that a black male came in with a sawed-off shotgun. He stated that the gun was eighteen to twenty inches long, and it was possibly a twelve gauge shotgun. He stated that the robber told him to lie on the floor, but did not take any money from him. Ezell said the robber was clean shaven, and he later saw Dixon, the appellant, during the first part of May, 1976. He said he thought he had a mustache at that time. He could not make a positive identification.
Booker T. Jones, a self-employed brick layer, indicated that on March 26, 1976, at approximately 8:00 o'clock in the morning, he was inside Banjo Grocery on Lomb Avenue in Birmingham. He stated he saw three men in the front of the store and three men in the back. He stated he picked up some items and walked up to the cashier's counter. He testified that a man standing there told the cashier to "Give me what you've got." Mr. Jones stated the robber had a sawed-off shotgun in his hand and pointed it at the "beer man" and told him to lie down on the floor. Jones stated that he hid his pocketbook before being directed to lie down on the floor. He remained there until the robber left.
Mr. Jones stated that the robber was a young, tall, clean shaven black male. He could not identify the robber.
Richard E. Royal, a Birmingham police officer, testified that he answered a call, shortly after 8:00 a.m., on March 26, 1976, at Banjo Grocery, located at 1600 Lomb Avenue in the southwest section of Birmingham. He stated that he talked with persons inside the store, then called for an evidence technician, Officer Wyatt.
Birmingham Police Officer Charles R. Wyatt testified that he went to Banjo Grocery, located on Lomb Avenue, on March 26, 1976, arriving there at 8:29 a.m. He stated that Officers Royal and Spears were at the scene when he arrived. Mr. Wyatt endeavored to raise fingerprints from a six-pack carton of beer and from the counter on which the carton was situated. He stated he was unable to get any reliable prints.
Birmingham Police Detective Tillman Carreker testified that he investigated the robbery of Mr. Tucker Smith at Banjo Grocery on March 26, 1976. He stated he received a description of the robber from Mr. Smith about 9:30 that morning. Officer *Page 693 
Carreker indicated that he arrested the appellant, Robert Thomas Dixon, on April 14, 1976. Carreker stated that he carried some photographs, two different groups, to Mr. Smith that afternoon and then again the next day. He stated that a photograph of the appellant, which he had obtained from Sergeant McKinsey of the Homewood Police Department, was included in the groups displayed to Tucker Smith. He stated that Smith made a positive identification of Robert Thomas Dixon from the photographs.
Officer Carreker also stated that he took the appellant to Police Headquarters on April 14, 1976, where he was placed in a lineup, and at this time Smith did not identify the appellant. Officer Carreker indicated that only Sergeant B.P. Thornton assisted him with the lineup, that no suggestions were made to anyone during the lineup, nor were they called upon to make a statement. Carreker indicated that he received the following description of the robber from Tucker Smith (R. p. 35):
 "A. Black male, nineteen to twenty, 5' 8", 150 lbs., medium afro, medium complexion, clean shaven, light tan leisure suit with a peach design on it and armed with a sawed-off shotgun.
 "Q. Did he say anything about the suspect having a moustache?
"A. No, sir."
The appellant, Robert Thomas Dixon, took the stand on voir dire to indicate that in April, 1976, he was living on Eighth Avenue, West, with his mother, Jacqueline Cogman, and his stepfather. He related that on April 14, 1976, Birmingham Police Detective Carreker came to his home and told him he wanted him to go to Police Headquarters for a lineup. He stated that something was mentioned about handcuffs, but he stated he would go voluntarily. He testified that another officer accompanied Officer Carreker and they spent about fifteen to twenty minutes searching his home.
Dixon stated that about eight other persons were in the lineup at Police Headquarters, all of whom were black males. Dixon indicated that some were shorter and some taller than he, and that during the lineup he observed three people talking and pointing in his direction. He was asked to say the words, "Give me your money or your life." He stated that he could not determine if the officers were pointing at him.
On cross-examination Dixon admitted that he had an uncle named Randy Foster who was in jail in connection with a robbery in Homewood. He stated that he had been with his uncle and was also arrested in Homewood, that he was on leave from the Army at the time of this occurrence. He stated that several photographs were made of him by Homewood police officers. Dixon indicated later that he thought Detective Carreker was present when he was placed in a lineup.
The trial court ruled that the in-court identification of the appellant by Tucker Smith was not "tainted" by pretrial identification procedures, and further overruled the appellant's motion to exclude, at the conclusion of the State's case, which challenged the lineup and the State's evidence.
Michael Barber testified that he was at Banjo Grocery on Lomb Avenue on March 26, 1976, shortly after 8:00 a.m. He stated that a black male came in with a sawed-off shotgun, pointed it at the owner, and made the customers in the store lie on the floor, then left. He described the robber as "a guy about 6 feet, brown leisure, it wasn't exactly brown leisure suit, light brown, something like it, straight hair, hair combed down, brown skin." He stated the robber was not Robert Thomas Dixon and that he had never see Dixon before.
On cross-examination Barber stated he worked at Midfield Volkswagen and had been interviewed by Detective Carreker in the office the previous day (August 24, 1976). Mr. Barber stated that Carreker showed him six or seven photographs, and he told Carreker that he could not say who the robber was, but he had gone to the store to "buy some milk." He stated that he recalled the "beer man" being inside the store, and that the robber had directed all of them to lie down on the floor. He stated that he had $5.00 on his person, but the robber told him he did not need his money and did not take it. *Page 694 
Upon being shown photographs, Barber indicated they were the "same ones" shown to him the previous day by Detective Carreker. Barber indicated the appellant's picture was in the group of the photographs, but his hair looked different. He stated he "did not believe it was the same man."
Donald Dortch testified that he was in Banjo Grocery on the early morning of March 26, 1976. Dortch indicated that seven or eight people were in the store when a black male entered with a sawed-off shotgun, but that the person who came into the store was "not Dixon." Dortch indicated that he "used to be a neighbor" of Dixon's, but the robber's hair was combed different from Dixon's. Dortch indicated the robber carried a sawed-off shotgun, twelve or sixteen gauge, and the barrel was not over ten inches long. He stated the robber was light skinned and clean shaven. He testified that he had been made to lie on the floor with the others when the robber fled.
Wilson Cogman, Jr., testified that he was the stepfather of Robert Thomas Dixon and resided at Apartment F, Eighth Avenue, West, in the City of Birmingham. He stated that on March 26, 1976, he did not leave for work until about 8:30 that morning, and that at this time his stepson was at home in his bed. Cogman indicated he was employed by Pilgrim Health and Life Insurance Company as debit manager and collected on the sale of policies. Cogman indicated that on the date in question, the appellant's mother and sister were also at home. He testified that he was not present on April 14, 1976, when his stepson was arrested and taken to Police Headquarters.
Robert Thomas Dixon testified that on March 26, 1976, he lived on Eighth Avenue, West, with his mother and stepfather, Mr. Cogman. He stated he was twenty-two years of age and "had never robbed anyone," that he had not been to the Banjo Grocery. Dixon stated he was five feet, ten inches tall and weighed about 140 pounds. Dixon stated he was arrested in mid-April by Detective Carreker. He stated that Donald Dortch was a friend of his, and that he had known him most of his life.
The defense then rested, and Detective Carreker was recalled.
Carreker indicated that when he showed the photographs to Michael Barber at Midfield Volkswagen, Barber stated, "The photograph of Dixon looks like the man, but I am not sure."
Robert Thomas Dixon was then recalled to the stand and stated that when he talked about seeing his friend, Donald Dortch, he meant that it was in May, 1975, because he was "locked up this year."
Donald Dortch was then recalled and stated that he saw the defendant, Dixon, come by his shop in May, 1976, and talked with him.
The evidence then being completed by both sides, the cause was recessed until the following day for argument and the charge to the jury.
 I
The appellant asserts that the State failed to prove a prima facie case and that the pretrial identification of the appellant was "tainted" by the identification procedure employed.
We do not agree.
This Court, through Judge Harwood, in Tunstill v. State,33 Ala. App. 460, 34 So.2d 857, cert. denied 250 Ala. 421,34 So.2d 859; and through Judge Harris, in Tarver v. State,53 Ala. App. 661, 303 So.2d 161, fully set forth the essential elements of the offense of robbery. We are of the opinion that these requirements were amply met.
Moreover, this Court has carefully considered the totality of the circumstances, as required by Simmons v. United States,390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, and determined that the exhibition to Mr. Tucker Smith of the photographs the day of the robbery and the following day was not so suggestive as to make his in-court identification of the appellant subject to be stricken. *Page 695 
Mr. Smith had ample opportunity to observe the appellant in a well-lighted store, moving about at the time of the robbery. His testimony at trial indicates this was the basis of his identification, and that he did select the appellant from photographs shown to him by Detective Carreker. Mr. Smith also indicated he did not identify anyone at a lineup as such.
We are of the opinion that the appellant's rights were adequately here safeguarded. Childers v. State, Ala.Cr.App.,339 So.2d 597, cert. denied, Ala., 339 So.2d 601; Henry v.State, Ala.Cr.App., 355 So.2d 411; and Lomax v. State, Ala.Cr.App., 355 So.2d 755.
 II
The appellant earnestly contends that his motion for a mistrial was due to be granted, as well as his motion for a new trial, each of which raised the question of appellant's attempted suicide, which took place outside the presence and hearing of the jury and of the court on the evening of August 25, 1976, after the evidence was completed. Because of the unique nature of this contention, we set forth verbatim the proceeding in the trial court in connection with this contention of error (R. pp. 105-116):
"THE COURT: All right, Ladies and Gentlemen, I'll let you beat the traffic. We will be in recess until 9:00 in the morning.
"(Thereupon, proceedings were in recess from 4:25 P.M. on August 25th, 1976 to August 26 at 1:45 P.M., when, out of the presence and hearing of the jury, the following proceedings were had and done:)
"August 26, 1976 1:45 P.M.
"THE COURT: For the record, the Court is appointing Hon. Mike McCormick as co-counsel for the completion of this trial.
"Mr. McCormick will be at the hospital room at the Cooper Green Hospital in Birmingham, Jefferson County, Alabama, representing the defendant and with the defendant. Hon. Walter Blocker will represent the State of Alabama, being a deputy district attorney. For the record, Mr. Ramsey has a motion to make.
"MR. RAMSEY: Your Honor, at this time I would like to move for a mistrial of this case based on the fact, it is my understanding that the defendant, at the present time, is in the Cooper Green Hospital as a result of an apparent attempted suicide. I think that raises, first of all, a question of his competency and mental stability. I think there needs to be an examination of him as to that matter. Second, I think proceeding as we are at this time would deprive him of his constitutional right to be present at all stages of the trial. I don't think he is able — is, in fact, a waiver of his rights to be present and I don't think the setup as we have it now would constitute the same as his being present, that is some type of telephonic communications between the Court and the hospital. It is my understanding there are tubes in his throat and he would not be able to communicate with counsel even being present there at the hospital. I think this, in itself would mean that he is not effectively present for the purposes of any further proceeding in this case. For these reasons, I would move for a mistrial at this time.
"THE COURT: Do you wish to be heard, Mr. Johnson?
"MR. JOHNSON: Yes, sir, we would point out that the defendant has absented himself of his own volition to; by attempting to stop this proceeding. I think the Court has made and I'm sure his Honor will go into this. The Court has made every precaution, is setting up this telephonic communication and appointing an assistant of Mr. Ramsey to be present with him. We would ask that the trial proceed.
"THE COURT: Anything further?
"MR. RAMSEY: No, sir.
"THE COURT: For the record, the Court was recessed on Wednesday, August 25, 1976, until Thursday, August 26, 1976, at 9:00. At approximately 8:30 A.M., August 26, 1976, the Court was informed that on the previous evening the defendant, who had presented all his evidence and testified in his own behalf, had swallowed a razor blade; that the defendant was taken to Cooper Green Hospital in Birmingham, Jefferson *Page 696 
County, Alabama, and was subsequently operated on for removal of the razor blade. The Court, personally contacted Dr. Swatsdruber, who is the attending physician for the defendant at said hospital. That Dr. Swatsdruber did inform the Court that the Defendant's condition is good, that in the afternoon of August 26, 1976, they intend to have him up and walking around; that the defendant does have a tube in his nostril and into his stomach as part of his post-operative care. That he also has tubes into his veins, being treated intravenously. The doctor further informed the Court that it was possible for the defendant to be placed on a stretcher and sent over to the Court for a period of approximately two hours. The doctor further informed the Court as late as 1:20 P.M. on August 26, '76, that the defendant is not under any medication, that he fully understands and is competent to understand the continuation of these proceedings. The Court feels that in the interest of justice that the proceedings should continue and the Court has instructed and has had electronic equipment installed in the courtroom and in the hospital room of the defendant. The Court has appointed the Hon. Mike McCormick as co-counsel in this cause and has sent Mr. McCormick in the presence of Deputy District Attorney Walter Blocker to represent the State and Mr. Brad Morris, who is an investigator from the District Attorney's office to operate the equipment at the hospital room, to be present at the continuation and conclusion of the proceedings. The Court is well aware that this is a matter of first impression in this jurisdiction and I feel that it is safe to say probably in any jurisdiction in the United States. To the knowledge of this Court, there is no case similar to the situation the Court has before it. The Court is aware of the cases, especially those decided by the Alabama Court of Criminal Appeals in excluding a ruly — or unruly disruptive defendant from the courtroom as shown by Keeby v.State. However, that is not the situation presented to this Court. The Court feels that due to the fact the defendant inflicted the wound upon himself in an apparent attempt to bring these proceedings to a mistrial, in order that this matter would not then be submitted to the jury, who has heard all the testimony and evidence. Both District Attorney Pete Johnson and Attorney Ed Ramsey have informed the Court that when the jury is brought into the courtroom, they both intend to rest; that no further evidence will be introduced, which leaves the trial in such a posture that we will have summation by the District Attorney and by the Defense Attorney and the charge of the Court to the jury. The Court feels that no constitutional right of the defendant is or has been violated or will be violated by proceeding in this manner. The Court overrules the motion for a mistrial.
"MR. RAMSEY: We respectfully except, Your Honor.
"THE COURT: Note an exception.
"(Thereupon, proceedings were in abeyance from 2:00 P.M. until 2:15 P.M., at which time out of the presence and hearing of the jury, the following proceedings were had and done:)
"THE COURT: For the record, the defendant Robert Thomas Dixon is in the hospital room at Cooper Green Hospital, Birmingham, Jefferson County, Alabama, in the presence of his now appointed co-counsel, Mr. Mike McCormick, Deputy District Attorney Walter Blocker, Mr. Brad Morris, who is an investigator for the district attorney's office, a sheriff's deputy and Mrs. Morris Womack. Mrs. Womack being an attending nurse. Mrs. Womack?
"MRS. WOMACK: Yes, sir.
"THE COURT: At this time, is the defendant conscious?
"MRS. WOMACK: Yes, he is.
"Q. Is he under any medication?
"MRS. WOMACK: Not at this time.
"THE COURT: Does he seem to be alert?
"MRS. WOMACK: Yes sir.
"THE COURT: In your opinion, does he understand the proceedings that are going on at this time?
"MRS. WOMACK: Yes, sir, he does. *Page 697 
"THE COURT: And he can hear?
"MRS. WOMACK: Yes, sir.
"THE COURT: Thank you, ma'am. Mike?
"MR. McCORMICK: Yes, sir.
"THE COURT: All right, I'm getting in a position to bring the jury in and we will then have the State and the defense officially rest in the presence of the jury and then commence summation.
"MR. McCORMICK: All right, sir.
"THE COURT: Are you ready?
"MR. McCORMICK: Yes, sir, we are ready.
"THE COURT: Is Mr. Blocker ready?
"MR. BLOCKER: Yes, sir.
"MR. RAMSEY: Judge, would you ask him if he communicated with the client or he can't communicate with the defendant?
"THE COURT: Mr. McCormick, can you communicate with the defendant?
"MR. McCORMICK: Yes, sir.
"THE COURT: Have you communicated with him?
"MR. McCORMICK: Yes, sir, I have.
"THE COURT: Does he, in your opinion, at this point understand the proceedings?
"MR. McCORMICK: Yes, sir.
"THE COURT: Are you, Gentlemen, ready?
"MR. JOHNSON: Yes, sir.
"MR. RAMSEY: Yes, sir.
"THE COURT: All right, bring the jury in.
"(Thereupon, the jury returned to the courtroom at 2:30 P.M., and the following proceedings were had and done:)
"THE COURT: For the record, anything further for the State?
"MR. JOHNSON: The State rests, Your Honor.
"THE COURT: Anything further for the defense?
"MR. RAMSEY: The defense rests.
"THE COURT: Are you Gentlemen ready to sum up?
"MR. JOHNSON: Yes, sir.
"MR. RAMSEY: Yes, sir.
"THE COURT: Before your summation, now, Ladies and Gentlemen, if you will notice the defendant, Robert Thomas Dixon, is not present in the courtroom. Would that fact that he is not present prejudice any one of you or all of you in any manner whatsoever, either for or against the defendant? Mr. Wainwright?
"MR. WAINWRIGHT: No.
"THE COURT: It would?
"MR. WAINWRIGHT: It would not.
"THE COURT: Mrs. Williamson?
"MRS. WILLIAMSON: No.
"THE COURT: Mr. Page?
"MR. PAGE: No.
"THE COURT: Mr. Green?
"MR. GREEN: No.
"THE COURT: Mr. Letson?
"MR. LETSON: No.
"THE COURT: Mr. Willingham?
"MR. WILLINGHAM: No.
"THE COURT: Mr. McGuier?
"MR. McGUIER: No, sir.
"THE COURT: Mr. Bates?
"MR. BATES: No.
"THE COURT: Mr. Sparks?
"MR. SPARKS: No, sir.
"THE COURT: Mrs. Christy?
"MRS. CHRISTY: No.
"THE COURT: Mr. Youngblood?
"MR. YOUNGBLOOD: No.
"THE COURT: Mrs. High?
"MRS. HIGH: No.
"THE COURT: Mr. Cantor?
"MR. CANTOR: No.
"THE COURT: Then you can proceed with this matter and render a fair and impartial decision? I presume by your silence that you can, is that correct, if that is not correct, please, someone raise their hand. Let the record show that no one raised their hand.
"MR. McCORMICK: Judge? *Page 698 
"THE COURT: Yes, sir.
"MR. McCORMICK: You are fading out on this end, sir.
"THE COURT: I didn't hear you.
"MR. McCORMICK: You are fading out on this end.
"THE COURT: I had set my mike down, I'm sorry. Did you hear what I said?
"MR. McCORMICK: Yes, I heard most of it. There are some parts I did not hear.
"THE COURT: For the record, I'll sum it up. The Court polled the jury, advised the jury that the defendant is absent from the courtroom. The jurors in being polled, informed the Court that that fact would not prejudice the jury in any manner, either for or against the defendant and that the jurors can still render a fair and impartial decision in this case. Do you hear that, Mr. McCormick?
"MR. McCORMICK: Yes, sir, we heard it fine.
"THE COURT: Are you gentlemen ready?
"MR. JOHNSON: Yes, sir.
"THE COURT: All right, Mr. Johnson, you may commence your summation."
Appellant asserts that the trial court was in error in resuming the trial proceedings without conducting a further or separate hearing into the appellant's "competency to stand trial" and cites us to Pate v. Robinson, 383 U.S. 375,86 S.Ct. 836, 15 L.Ed.2d 815; and Pierce v. State, 52 Ala. App. 422,293 So.2d 483, cert. quashed 292 Ala. 745, 293 So.2d 489.
Our careful research in this case reveals that the issue here presented is sui generis. Must a trial court grant a mistrial or a new trial where, as here, all the evidence had been completed and there had been no prior indication whatsoever to the trial court of any problem concerning the appellant's mental competency to stand trial prior to his suicide attempt following the close of the evidence, but before closing argument and the charge by the trial court? Had this attempted suicide occurred at some other or prior point in the proceeding, perhaps a different result might obtain. We are not, however, called upon here to speculate on what our future holding in such a situation might be.
Suffice it to say that here the trial judge conferred with the attending physician and determined that the appellant was competent and had his mental faculties, and in fact he could have been brought to court on the afternoon of August 26, 1976, for the completion of the proceeding had that been deemed to be desirable. The trial judge, after conferring with Dr. Swatsdruber, determined that it would be best to have a nurse, Mrs. Morris Womack, and two attorneys present in the hospital room, which was connected telephonically with the courtroom. This would safeguard the appellant's condition and his right to be present at all stages of trial. Clearly, there can be no issue of denial of confrontation and cross-examination because all parties to the proceeding, including the appellant, had testified in open court the previous day, August 25, 1976.
Careful examination of the record of the afternoon of August 26, 1976, indicates that only three objections were made to the closing argument, each of which was sustained and instruction given to the jury to dismiss the statement of counsel as not being evidence in the cause. Further, following the oral charge of the court, each side announced, "Satisfied," and no exception was taken (R. p. 125). Thereafter, the trial judge gave five of the written requested charges at the request of appellant's counsel. Before the resumption of this proceeding, the trial judge carefully polled each member of the jury, each of whom affirmatively reflected that he would not be prejudiced in his deliberation by the appellant's absence from the courtroom or against the appellant in any manner by virtue of the occurrence in question (R. pp. 114-115).
Mrs. Womack, the nurse attending at the direction of Dr. Swatsdruber, and each of the two attorneys appointed by the court indicated that the appellant was alert, able to communicate with his counsel and the court, and could clearly hear the proceedings. *Page 699 
We need not digress at this juncture into suicide and its attendant status and penalties under the law. See New York LifeInsurance Company v. Turner, 213 Ala. 286, 104 So. 643; McMahanv. State, 168 Ala. 70, 53 So. 89; Penn Mutual Life InsuranceCompany v. Cobbs, 23 Ala. App. 205, 123 So. 94; also Annotations, 92 A.L.R. 1180; 112 A.L.R. 1278; 72 A.L.R.2d 554 at page 631.
This Court has determined from its examination of the record that the appellant, Robert Thomas Dixon, was "competent to understand and continue the trial proceedings." We also note that Dixon had received the proper medical treatment and fully comprehended the proceedings, which were resumed under the conditions as herein outlined. The appellant at this point had the capacity to transact business. See Seibold v. State,50 Ala. App. 613, 281 So.2d 667, cert. denied 291 Ala. 797,281 So.2d 668.
This Court fully recognizes that it has long been the law of this state that a party may not voluntarily absent himself from the trial proceedings and then seek to profit by attacking the vitality of the judicial process caused by his own action.Jackson v. State, 38 Ala. App. 114, 78 So.2d 665; and Aldridgev. State, 278 Ala. 470, 179 So.2d 51.
As pointed out by Judge Harris in Robinson v. State, Ala.Cr.App., 337 So.2d 1382:
 "A defendant has no right to receive a mental examination as to his sanity whenever he requests one and, absent such a right, the trial court is the screening agent as to such request. Pace v. State, 284 Ala. 585, 226 So.2d 645."
Moreover, this Court is fully committed to the principle laid down by the Supreme Court of Alabama in Shadle v. State,280 Ala. 379, 194 So.2d 538:
 ". . . [I]t is well recognized that the granting of a mistrial is within the sound discretion of the trial court, for he, being present, is in a much better position to determine what effect, if any, some occurrence may have upon the jury's ability to decide the defendant's fate fairly and justly. And we will not interfere with the trial judge unless there had been a clear abuse of discretion. . . ."
Having carefully weighed all the circumstances attendant to the attempted suicide by Dixon, and the careful treatment and handling of this matter by the trial court, as herein above outlined, we are clear to the conclusion that no abuse of discretion is here shown. The trial judge determined, after consultation with the attending physician and nurse, the appellant was competent to resume the proceedings, and he appointed counsel to assist and be present in the hospital room and in the courtroom to aid Dixon. The hospital room was connected telephonically with the courtroom, and no error is shown, nor adverse ruling shown, with reference to the resumption and completion of the trial proceedings.
Moreover, upon receipt of the verdict, each juror was individually polled a second time, and each stated that the verdict was his. Ten years is the minimum punishment for robbery in Alabama. This was the verdict rendered in this cause.
We have carefully weighed all of the circumstances presented and are of the opinion that no error is presented.
We are further of the opinion that the trial judge fully complied with the requirements of Pate v. Robinson,383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815; and Pierce v. State,52 Ala. App. 422, 293 So.2d 483, cert. quashed 292 Ala. 745,293 So.2d 489, by virtue of the hearing and procedures here employed.
 III
A third issue presented for review in this cause is raised by appellant's counsel in his motion for new trial wherein he asserts the following (R. p. 154):
 "3. The defendant was denied his right to be present at every stage of the trial.
 "4. A mistrial was erroneously denied when the defendant's competency to stand trial became an issue due to an attempted suicide." *Page 700 
In reviewing the issue as raised by the motion for a new trial, supra, we note there is in the record a letter from Donna C. Click, Social Worker of the office of the Sheriff of Jefferson County, Melvin Bailey, to Mr. Wadell Zanaty, Court Coordinator, with copies to the trial judge, the chief correctional officer, and the district attorney's office. This letter and the accompanying letter from Dr. B.E. Blankenship, Medical Doctor and Psychiatrist, University of Alabama in Birmingham, who examined the appellant, are as follows (R. pp. 152-153):
"October 18, 1976
 "Mr. Wadell Zanaty Court Coordinator Jefferson County Courthouse Birmingham, Alabama 35203
"RE: Robert T. Dickson [sic]
"Dear Mr. Zanaty:
 "Enclosed is a copy of a letter from Dr. B.E. Blankenship, who examined the above named individual on October 12, 1976, in the Jefferson County Jail, at the request of Chief Warden, Lionel Bragan.
 "This individual has been sentenced to ten (10) years on a charge of robbery, and is now awaiting trial on a robbery charge. Dr. Blankenship feels this individual should be transported to the appropriate state facility because of his attempts to commit suicide. Any assistance you can give to help expedite this man to Bryce or the state prison system as soon as possible, would be greatly appreciated.
 "Should you have any questions concerning this individual, please do not hesitate to contact me.
"Yours truly,
 S/ Donna C. Click
Donna C. Click Social Worker
"DCC/mlb
 CC: Honorable Joseph Jasper, Judge Lionel Bragan, Chief Correctional Officer District Attorney's Office B.E. Blankenship, M.D."
 "TO: (Referral) Lionel L. Bragan, Chief Correctional Officer
 "FROM: B.E. Blankenship, M.D.
Psychiatrist, University of Alabama in Birmingham
"DATE EXAMINED: October 12, 1976
"INFORMATION FURNISHED BY: Jacqueline Cogman
"PREVIOUS PSYCHIATRIC TREATMENT: [Left blank]
 "SUMMARY October 15, 1976
"RE: Robert T. Dickson
"Dear Chief Bragan:
 "On October 12, 1976, in the Jefferson County Jail, I had occasion to perform psychiatric evaluation on Robert T. Dickson. Historical information was obtained by Mrs. Donna Click from the patient's mother, Jacqueline Cogman. This individual *Page 701 
has been sentenced to ten (10) years on a robbery charge (case number 36300), and is awaiting trial on another robbery charge. This individual has a past history of eating glass, paint chips, and razor blades.
 "On examination today, this individual was a lucid, partially oriented black male with a sad and depressed mood. His affect was inappropriate and appears withdrawn. He was poorly organized in a psychological sense, and appears to be delusional. He has dull to normal intelligence.
 "This individual is functioning in a psychotic range, and should be committed to the appropriate state hospital for a period of observation and treatment.
"S/ B.E. Blankenship M.D.
 "CC: Honorable Joseph Jasper, Judge District Attorney's Office Wadell Zanaty, Court Coordinator"
This resulted in the following order entered October 25, 1976, by the Honorable Charles R. Nice, Circuit Judge (R. p. 151):
"STATE OF ALABAMA IN THE CIRCUIT COURT
VS TENTH JUDICIAL CIRCUIT
ROBERT T. DICKSON OF ALABAMA, CIRCUIT
COURT NOS. 36300 36301
"ORDER COMMITTING DEFENDANT TO INSANE HOSPITAL
 "WHEREAS, the defendant Robert T. Dickson, is in confinement in the County Jail of Jefferson County, Alabama, being held under an indictment returnable to Jefferson County Circuit Court charging him with Robbery, and whereas it appears to the Court that he is probably insane, and this Court has instituted a careful investigation of defendant's mental condition, has called Dr. B.E. Blankenship, psychiatrist, and Sheriff Melvin Bailey and Chief Correctional Officer Lionel Bragan, who are in charge of said defendant where he is so confined; and from the testimony of two witnesses, Donna Click and Chief Bragan, it has been satisfactorily proved that defendant probably has a mental disease and is probably insane.
 "NOW, THEREFORE, it is by the Court ordered, pursuant to Title 15, Section 428, of the Code of Alabama as recompiled in 1958, that the Sheriff of Jefferson County discharge defendant from said imprisonment in the County Jail and safely remove him to the Bryce Hospital for the Insane at Tuscaloosa, Alabama, and deliver the person of the defendant to the Superintendent of said hospital where said Superintendent and all other proper officers of said hospital are ordered and directed to keep defendant in safe custody until he is restored to his right mind and at which time said Superintendent shall inform this Court and the Sheriff of Jefferson County, whereupon said Sheriff is ordered to go to said hospital, take defendant into custody and remand him to confinement, without bond, in the County Jail of Jefferson County, Alabama, until further order of Court. Said hospital authorities are directed and enjoined to keep said defendant in safe custody at all times and not to release him except to the Sheriff of Jefferson County unless otherwise ordered by this Court.
 "DONE AND ORDERED this 25th day of October, 1976. "S/ Charles Nice
JUDGE, CIRCUIT COURT" *Page 702 
The issue here presented is a close one because there is here presented evidence of a medical doctor and practicing psychiatrist, who examined the appellant on October 12, 1976, approximately six weeks following trial, and determined that the appellant was functioning in a psychotic range and should be committed to a state hospital for observation and treatment.
Moreover, following a hearing on this matter, the Honorable Charles Nice, Circuit Judge, entered an order stating that it "had been satisfactorily proved that the defendant (appellant) probably has a mental disease and is probably insane."
The appellant had another robbery charge pending against him, so no doubt Judge Nice felt it appropriate to have a determination of his competency to stand trial made pursuant to Title 15, Section 428, Code of Alabama 1940, as recompiled 1958. See also Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836,15 L.Ed.2d 815.
Confronted with the foregoing matters, the trial judge had originally set the motion for new trial for October 22, 1976. This motion was continued until November 19, 1976, and denied without further opinion.
It thus appears that the trial judge was confronted with the issue of a confrontation in views between the physician who treated the appellant at the time of his attempted suicide, and subsequently advised the trial court that the appellant was "competent to understand the continuation of the trial proceedings," and the views expressed by Dr. Blankenship.
Though the matters hereinabove set forth raise a serious question as to the appellant's competency to stand trial, we cannot ascribe error to the trial judge, who no doubt relied upon the advice of the original attending physician. The motion for a new trial was therefore properly overruled.
We have carefully examined this record and find no error. The judgment is therefore
AFFIRMED.
All the Judges concur. *Page 952